IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DREYMOOR FERTILIZERS OVERSEAS   )
PTE. LTD. a Singapore entity,   )
   )
          Plaintiff,   )
   )
vs.   )      Case No.
   )
ANNA MIKHAILOVA n/k/a a/k/a ANNA   )
ADAMS,   )
   )
          Defendant.   )
   )

## COMPLAINT

COMES NOW Dreymoor Fertilizers Overseas Pte. Ltd. ("Dreymoor"), by and through its counsel for its Complaint and causes of action against Anna Mikhailova n/k/a a/k/a Anna Adams, states and alleges as follows:

### INTRODUCTION

1.    This action arises from tortious misrepresentations made by Defendant Anna Mikhailova ("Ms. Mikhailova") in connection with approximately $5.7 million in funding provided by Plaintiff Dreymoor for the purchase of 27,000 metric tons of fertilizer by companies she controlled, AVAgro LLC and UAB AVAgro, while at the same time she was diverting sales proceeds that she represented would be used to repay Dreymoor on the basis of which representations Dreymoor extended the maturity of the debt owed.

2.    When UAB AVAgro, the original obligor defaulted on its obligation to repay Dreymoor in 2018 after it was unable to resell the fertilizer purchased with Dreymoor's funds, Ms. Mikhailova reaffirmed the debt due, and agreed to substitute a further entity which she owned, AVAgro LLC, a Kansas limited liability company, that she represented had separate

assets which would be used to repay Dreymoor. Ms. Mikhailova also agreed to personally guarantee the debt, but in the meantime secretly used the limited assets of AVAgro LLC to fund new business leaving the Dreymoor debt unpaid while the purchased fertilizer plummeted in value and racked up millions of dollars of storage charges that AVAgro also failed to pay.

3.      Ms. Mikhailova then disposed of those assets of AVAgro LLC putting them beyond the reach of Dreymoor during the pendency of arbitration between Dreymoor and UAB AVAgro and AVAgro LLC where a final award has now been entered against UAB AVAgro and AVAgro LLC in excess of $6 million which remains unpaid.

4.      Ms. Mikhailova admitted much of the foregoing in testimony in that arbitration. Most importantly, she acknowledged that Dreymoor is owed the amount awarded in the arbitration and that she had diverted the funds which she represented would be paid to Dreymoor for other transactions entered into by her companies. She also admitted that she had agreed to personally guarantee repayment of the amount due Dreymoor.

5.      Dreymoor now seeks to recover the amount it advanced to Ms. Mikhailova and her companies and the significant additional damages suffered. Dreymoor also seeks to pierce the corporate veil of the companies controlled by Ms. Mikhailova due, among other things, to her commingling of their assets and operations, and hold her - and any other persons with undisclosed interests in these companies who conspired with her - responsible for the damages suffered by Dreymoor.

6.      Further, as Ms. Mikhailova's actions were willful, wanton, fraudulent, reckless, and/or malicious, punitive damages should also be awarded to Dreymoor.

**PARTIES, JURISDICTION & VENUE**

7.      Dreymoor is a company registered in Singapore with its principal place of

2

business at 24 Raffles Plaza, 12-06 Clifford Centre, Singapore 048621, and is engaged in the business of trading fertilizer products.

8.      Anna Mikhailova a/k/a Anna Adams ("Ms. Mikhailova") is a resident of Butler County, Kansas with her principal address at 550 N. 159th E., Suite 100A, Wichita, Kansas.  Ms. Mikhailova's is purportedly the sole owner of, managing member, and chief executive officer of at least two entities, AVAgro LLC, a Kansas limited liability company, with its principal place of business at 550 N. 159th St. East, Ste. 100A, Wichita, Kansas 67230, and UAB AVAgro, a Lithuanian corporation.

9.      UAB AVAgro is wholly owned by AVAgro LLC, which in turn is purportedly wholly owned by Ms. Mikhailova. Both of these entities and Ms. Mikhailova are engaged in the business of trading fertilizer products. Hereinafter, unless stated differently, reference to "AVAgro" is inclusive and collective of UAB AVAgro and AVAgro LLC.

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because the parties are diverse from each other, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court has proper personal jurisdiction over Ms. Mikhailova, as she is a resident of this judicial district, owns property, assets, and businesses in this judicial district, and committed acts or omissions relative to the claims herein while in this judicial district.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Ms. Mikhailova does business in this judicial district, resides in this judicial district, owns property in this judicial district, maintains offices in this judicial district, and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

CORE/9991000.5423/158595065.1

## COMMON OPERATIVE FACTS

13.     This matter relates to a fraud perpetuated by Ms. Mikhailova against Dreymoor in which she arranged for Dreymoor to provide the companies she owned with approximately $5.7 million in short term advances to purchase approximately 27,000 metric tons of fertilizer and then failed to repay any amount to Dreymoor while at the same time diverting funds that were intended to be used to repay Dreymoor.

14.     On October 17, 2018, UAB AVAgro won a tender from the Belarusian fertilizer producer OAO Grodno Azot ("Grodno") for the purchase of Urea-Ammonium Nitrate Solution ("UAN"), a liquid fertilizer product (hereinafter the "Product"), for delivery to UAB AVAgro at Joint Stock Klaipeda Stevedoring Company ("Klasco") in Klaipeda, Lithuania. UAB AVAgro required short term (approximately one month) funding for this shipment. Dreymoor agreed to provide this by purchasing the UAN with UAB AVAgro having an obligation to buy it back if it could not be sold to a third-party within such period. Thus, UAB AVAgro assumed the risk of finding a buyer for the Product within a short period, failing which it would have to repurchase it from Dreymoor.

15.     To document this, on October 22, 2018, UAB AVAgro and Dreymoor entered into a Sales Contract (the "Sales Contract") pursuant to which Dreymoor paid UAB AVAgro the amount it needed to pay Grodno and simultaneously bought the Product from UAB AVAgro. The parties agreed to on-sell the Product to third-party buyers and share the profits thereof. A true and correct copy of the Sales Contract is attached hereto as Exhibit A.

16.     Ms. Mikhailova personally negotiated the Sales Contract with Dreymoor. When the Sales Contract was finalized on October 22, 2018, it stated in the Sales Contract, "As per

4

various discussions, AVAgro LLC is pleased to confirm the sale . . .", even though, ostensibly, UAB AVAgro was the corporate entity that was party to the 0020Sales Contract.

17.     The Sales Contract concerned a quantity of 25,000 metric tons +/- 10% of UAN which was to be purchased from Grodno and resold by UAB AVAgro. The ultimate quantity of Product purchased by UAB AVAgro was 27,464.55 metric tons. The purchase price paid to Grodno was €208.80 per metric ton resulting in a total purchase price for the Product of €5,742,000 (the "Purchase Price").

18.     On October 22, 2018, Dreymoor paid UAB AVAgro €5,742,000, pursuant to the Sales Contract. No Product was delivered by UAB AVAgro at that time and the full amount was not finally delivered until several months later.

19.     UAB AVAgro and Dreymoor also entered into Amendment #1 to the Sales Contract dated October 26, 2018 ("Amendment #1") which contained UAB AVAgro's buy back obligation. Specifically, Amendment #1 provided that if the Product could not be resold to a third party by November 26, 2018 (one month later), UAB AVAgro would repurchase it from Dreymoor at a price €3 per metric ton higher than Dreymoor had paid, (i.e. a buy back price of €211.80 per ton), plus Dreymoor's borrowing costs for the funds paid to UAB AVAgro. This repayment was referred to by the parties as the "Buy-Back." Amendment #1 provided that in the event of any delay in payment by UAB AVAgro, Dreymoor was entitled to a late charge penalty of 0.02% of the unpaid amount each day, but not to exceed 10% of the Product's value. A true and correct copy of Amendment #1 is attached hereto as Exhibit B.

20.     Dreymoor utilized credit facilities it maintained with Unicredit Bank AG to obtain the funds which it paid to UAB AVAgro under the Sales Contract. Ms. Mikhailova was aware of Dreymoor's relationship with Unicredit from her extensive prior transactions with Dreymoor,

5

starting in 2016. Ms. Mikhailova was also aware that Dreymoor was borrowing the funds which it was providing to UAB AVAgro for this specific transaction from Unicredit. Indeed, Amendment #1 provided that UAB AVAgro would repay Dreymoor "for the financial costs with Unicredit Bank AG." Consequently, UAB AVAgro and Ms. Mikhailova knew Dreymoor had utilized its own credit to provide the financing under the Sales Contract.

21.     Ms. Mikhailova was also aware that Unicredit had specifically required certain documents from Dreymoor in order to proceed with the transaction and she testified accordingly at the arbitration hearing. When Ms. Mikhailova provided documents that appeared to Unicredit to be either inaccurate or fraudulent, Dreymoor was at risk of losing its lines of credit with Unicredit, thus not only threatening the transaction, but Dreymoor's ongoing business.

22.     Moreover, when AVAgro failed to repay Dreymoor promptly, Ms. Mikhailova was aware that the delay in payment was also threatening Dreymoor's relationship with Unicredit. Yet, she made repeated representations that payment would be forthcoming imminently from her other funds knowing, but not disclosing to Dreymoor, that in fact that this was not going to occur as she used those funds to pay for new business transactions she had undertaken through her companies while Dreymoor's debt went unpaid. She knew that Dreymoor had informed its bank, Unicredit, of her promises and the plan for imminent payment and that her failure to make such payment (which Dreymoor had pledged to pay to its bank) could seriously damage Dreymoor's business relationship with Unicredit which provided much of Dreymoor's overall trade financing.

23.     Throughout all negotiations and discussions with Dreymoor regarding the Product and associated contracts, Ms. Mikhailova referred to herself, UAB AVAgro, and AVAgro LLC, collectively, as one and the same.

24.     The Product is in a liquid form and required specialized storage facilities at the Port of Klaipeda, Lithuania from where it was to be sold to a third party. UAB AVAgro arranged to have the Product stored at Klasco and entered into Contract No. 33-18-0336-E-234F with Klasco.

25.     It was intended that the Product would be stored for a short period prior to resale to a third party. This would later become critical because as a result of Ms. Mikhailova's and UAB AVAgro's fraud and breach of contract as described below, the Product has been stored by Klasco for more than 15 months without payment and Klasco is seeking more than €2 million before it will release the Product. The Product has also declined in value as a result of which the storage charges claimed may soon exceed the value of the Product. If that occurs, the entire amount paid by Dreymoor for the Product will likely be unrecoverable from AVAgro which has no substantial other known assets.

26.     UAB AVAgro was unable to arrange a sale of the Product by November 26, 2018, and Dreymoor accordingly demanded that UAB AVAgro honor its Buy-Back obligation to which UAB AVAgro agreed.

27.     Accordingly, on November 26, 2018, Dreymoor issued a "Buy-Back" invoice to UAB AVAgro, pursuant to Amendment #1, for €5,835,625.13, due on November 29, 2018 (the "Buy-Back Invoice"). A true and correct copy of the Buy-Back Invoice is attached hereto as Exhibit C.

28.     On December 3, 2018, Mr. Shimonavich of Dreymoor emailed Ms. Mikhailova, thanking her for agreeing to pay Dreymoor by December 5, 2018. Ms. Mikhailova did not contradict Mr. Shimonavich.

CORE/9991000.5423/158595065.1

29.     Subsequent to issuance of the Buy-Back Invoice, and at Ms. Mikhailova's request, the due date for payment to Dreymoor was revised several times in reliance on Ms. Mikhailova's representations and promises to Dreymoor that payment was forthcoming from other sources she had. Dreymoor went out of its way to attempt to cooperate with Ms. Mikhailova and provide her additional time to pay the amount due under the Buy-Back.

30.     After repeated representations from Ms. Mikhailova that payment would be forthcoming in the following days, on November 29, 2018, Dreymoor issued a revised "Buy-Back" invoice to UAB AVAgro, in the same amount as the Buy-Back Invoice and with a due date of December 4, 2018 (the "Revised Buy-Back Invoice"). A true and correct copy of the Revised Buy-Back Invoice is attached hereto as Exhibit D.

31.     UAB AVAgro did not pay the Buy-Back Invoice, Revised Buy-Back Invoice, or any subsequent invoice issued by Dreymoor.[1] UAB AVAgro is in default of its payment obligations to Dreymoor, as is Ms. Mikhailova as set forth below.

32.     After UAB AVAgro defaulted on its payment obligations to Dreymoor, Ms. Mikhailova confirmed, verbally and in writing, that all details with respect to sales of any materials sold by UAB AVAgro to third-parties would be provided to Dreymoor and sales proceeds would be assigned to Dreymoor to be applied against the amount due under the Buy-Back wherever it was not possible for Dreymoor to receive the proceeds directly from UAB AVAgro's buyers. Specifically, Ms. Mikhailova promised that UAB AVAgro would provide Dreymoor with full disclosure of the details of any sale of the Product, including bills of lading, that any unsold portion of the Product would be stored in storage in the United States controlled by AVAgro LLC for further sales at market prices, that all proceeds of those sales would be

---

[1] UAB AVAgro did make payments to Dreymoor on January 31, 2019, and April 23, 2019, of €60,865.20 and €68,729.10, respectively.

directed to an account specified by Dreymoor until all amounts were repaid in full, and that Dreymoor would not lose any money on the transaction, with the pledge of further, unrelated AVAgro LLC products as a guarantee in that regard.

33.     In addition, Ms. Mikhailova thanked Dreymoor profusely for its support, failing which she would be "completely destroyed *personally and professionally*, as I am sole owner of AVAgro LLC and *pledging my personal assets via personal guarantee.*" A true and correct copy of Emails from Ms. Mikhailova are attached hereto as Exhibit E. (Emphasis added).

34.     Ms. Mikhailova repeatedly from December 2018 through at least April 2019, in personal meetings and other communications with Dreymoor, represented and warranted to Dreymoor that she and AVAgro would be receiving substantial funds from earlier sales and that Dreymoor would be repaid from the funds AVAgro had and was receiving from earlier sales, and not solely from the funds received from sale of the Product that Dreymoor had financed.  Ms. Mikhailova personally obligated herself, committed, promised, and assured Dreymoor that funds collected by her or AVAgro from other transactions would be disclosed to Dreymoor and used to repay Dreymoor and there would not be any further delay in repayment.

35.     However, despite these representations, warranties, statements and commitments to Dreymoor, by November 30, 2018, Ms. Mikhailova knew that the funds which she represented would be paid to Dreymoor were, in fact, going to be used by her in December 2018 to secretly prepay for AVAgro's 2019 purchases (from a company affiliated with the storage company holding the UAN paid for by Dreymoor). Ms. Mikhailova knew when doing this that she was defaulting on her agreements with Dreymoor and that her prior representations, statements, and commitments to Dreymoor regarding forthcoming payment were knowingly false and misleading. Ms. Mikhailova admitted in later sworn testimony (discussed below) that she

directed funds and proceeds to other uses, instead of repaying Dreymoor. Ms. Mikhailova's actions have exposed Dreymoor to substantial financial risks with its own bank creditors, as well as cash flow problems and lost business opportunities.

36.     Ms. Mikhailova did not share financial documents, give proof of Quarter 1 purchases on December 12, 2018, provide Dreymoor any sales contracts with buyers, or update Dreymoor as to Quarter 1 tonnage loading and buyer payments, as she agreed to do.

37.     Having failed multiple times to pay Dreymoor the amount due pursuant to the Sales Contract and Amendment #1, Ms. Mikhailova proposed to shift the Buy-Back responsibilities to AVAgro LLC, pledge AVAgro LLC assets as security, and obligate herself personally to guaranty to repay the debt owing to Dreymoor. At a meeting in Nashville, Tennessee, between Ms. Mikhailova and Dreymoor representatives, on or about December 18, 2018, Ms. Mikhailova verbally committed to personally guaranteeing payment to Dreymoor of the obligations owed by AVAgro relative to the Product. This is substantiated by the emails sent by Ms. Mikhailova to Dreymoor following the in-person meeting, wherein she continued to reiterate to Dreymoor her personal guaranty of the obligations owed to Dreymoor. It was agreed: (a) AVAgro LLC would pledge the UAN stored in Lithuania to Dreymoor, (b) AVAgro LLC would pledge other UAN stored in the United States to Dreymoor, and (c) Ms. Mikhailova, purportedly the sole owner of AVAgro LLC (which is the sole owner of UAB AVAgro), would personally guaranty the mounting debt owed to Dreymoor. AVAgro and Ms. Mikhailova admitted in statements and representations to Dreymoor that the money was owed.

38.     In an email dated December 19, 2018, Ms. Mikhailova stated to Dreymoor, "*I defaulted* on repaying Dreymoor on time as we missed good sales opportunities and *I mismanaged AVAgro's finances* by asking Dreymoor for help with payment for Grodno's tender.

*To keep my promise to Dreymoor I am willing to loose [sic] quite a bit as per the action plan below [which included a statement of personal guarantee] . . .*" (Ex. E) (emphasis added).

39.     In an email dated December 19, 2018, immediately following the in-person meeting in Nashville, Ms. Mikhailova explicitly told Dreymoor, "**now I will guarantee LLC [AVAgro, LLC] performance under the buyback instead of UAB [UAB AVAgro]**." Ms. Mikhailova electronically signed this email in her personal name. (Ex. E) (emphasis in original).

40.     In an email dated December 19, 2018, immediately following the in-person meeting in Nashville, Ms. Mikhailova explicitly told Dreymoor, "*As I promised* from the beginning that Dreymoor would not lose any money helping AVAgro UAB to pay for Grodno product [Product], *I will pledge* 2,500-3,000 ST (current market value of $765,000) of AVAgro LLC's inventory at Kinder Morgan terminal toward any losses on this transaction plus interest." (Emphasis added). Ms. Mikhailova also stated in an email dated December 19, 2018, ". . . and *I am willing to do whatever possible to survive the current situation personally and professionally*." Ms. Mikhailova electronically signed these emails in her personal name. (Ex. E) (emphasis added).

41.     In an email dated December 20, 2018, Ms. Mikhailova told Dreymoor, "As discussed, during my visit to Dreymoor's office yesterday [actually December 18, 2018], the responsibility ultimately rests with AVAgro LLC *and my personal guarantee* . . ." Ms. Mikhailova electronically signed this email in her personal name. (Ex. E) (emphasis added).

42.     In an email dated December 21, 2018, Ms. Mikhailova told Dreymoor, "The balance after it's known *will be covered by my personal guarantee* . . ." Ms. Mikhailova electronically signed this email in her personal name. (Ex. E) (emphasis added). As it relates to

this particular email, Ms. Mikhailova has provided sworn testimony admitting she personally guaranteed payment to Dreymoor.

43.     Throughout December of 2018, Ms. Mikhailova made various representations concerning the timing of full payment, and requested extensions of time to make the payments from Dreymoor. In allowing Ms. Mikhailova and AVAgro additional time to pay, Dreymoor relied on Ms. Mikhailova's statements and promises of personal guaranty with the expectation it would be paid in full.

44.     Ms. Mikhailova presented Dreymoor with a "worst-case scenario repayment schedule" of paying 25% of the balance within the period of January 20-25, 2019, and the remaining 75% of the balance within the period of February 10-15, 2019. (Ex. E). Ms. Mikhailova promised Dreymoor would be repaid in 30 days and Dreymoor would not lose any money by helping her to pay for the Product. This undertaking was reiterated to Dreymoor several times in writing and verbally after Ms. Mikhailova and AVAgro failed to repay Dreymoor as promised. Yet, Ms. Mikhailova's consistent conduct was misleading, false, and gave no regard for the impact delays in payment would have on Dreymoor's business and finances.

45.     On December 21, 2018, Ms. Mikhailova sent Dreymoor signed contracts designated as "Agreement on Repayment and Pledge" and "Amendment #2" to the Sales Contract, which Dreymoor countersigned. See Agreement on Repayment and Pledge and Amendment #2 attached as Exhibits F and G, respectively.

46.     The Agreement on Repayment and Pledge required full payment be made to Dreymoor on the Sales Contract and Amendment #1, on or before January 31, 2019.

47.     Dreymoor's consent to the extension of additional time to January 31, 2019, to make repayment was in reliance on an element of the agreement being Ms. Mikhailova's personal guaranty, which she agreed to verbally and in writing.

48.     On numerous occasions, Dreymoor advised Ms. Mikhailova that it faced cash flow problems it was incurring significant business losses by losing lucrative business opportunities due to the delay in repayment.

49.     The obligation to pay Dreymoor the funds advanced under the Sales Contract, Amendment #1, Amendment #2, and Agreement on Repayment and Pledge (collectively the "Contracts") is a joint and several obligation of AVAgro LLC, UAB AVAgro, and Ms. Mikhailova, personally.

50.     Notwithstanding the fact that the amount owing under the Contracts was never paid to Dreymoor, UAB AVAgro initiated an arbitration action against Dreymoor in 2019 seeking various declarations regarding the obligations of the parties under the Contracts, styled *UAB AVAgro v. Dreymoor*, International Centre For Dispute Resolution International Arbitration Rules and Procedures, Case No. 01-19-0000-3381.

51.     In response, Dreymoor filed a counterclaim against UAB AVAgro and AVAgro LLC, seeking payment of the debt owed under the Contracts. After the hearing in that action, the arbitrator awarded Dreymoor €6,211,091.06 and $339,761.42, jointly and severally, against both UAB AVAgro and AVAgro LLC.  Petitions to enforce that award have now been filed in Kansas and Lithuania.

52.     Meanwhile, neither UAB AVAgro, AVAgro LLC or Ms. Mikhailova have repaid any of the amounts owing under the Contracts or the amount awarded in the arbitration. The Product continues to be stored at the Klasco terminal in Lithuania, the market price for the

Product has dropped dramatically, causing a significant reduction in its value, and the storage fees continue to mount such that the alleged storage fee threatens to eclipse the value of the Product.

53.     As of February 15, 2020, the amount due and owing to Dreymoor under the Contracts is €6,211,091.06 and $339,761.42, and starting 30 days thereafter simple daily interest of 0.02% accrues on unpaid amounts, until paid. Dreymoor is also entitled to recovery of all its attorney fees, costs, and expenses associated with the Contracts and Product.

## COUNT I:  INTENTIONAL MISRESPRESENTATION & FRAUD

54.     The allegations contained in Paragraphs 1 through 53 are incorporated herein, as if stated in full.

55.     Ms. Mikhailova made representations to Dreymoor, in the course of her personal activities, business, profession, and employment, relative to the Contracts and Product, in which she had a direct or indirect pecuniary interest, for the guidance of Dreymoor in its business transactions and decisions, which she knew to be false and misleading.

56.     Ms. Mikhailova made promises and statements to Dreymoor that she knew were false, or made recklessly, with the intent of getting Dreymoor to rely on such promises and statements.

57.     For example, and without limitation: (a) Ms. Mikhailova represented funds generated from her other business operations existed and would be used to pay Dreymoor to induce Dreymoor to extend the time for her companies to pay the Buy-Back, when she knew such representation was false and fully intended to and had committed to divert such funds to prepay for 2019 purchases; and (b) Ms. Mikhailova promised and represented to Dreymoor she would personally guaranty payment to Dreymoor of the obligations owed relative to the

Contracts and Product to secure extension of the repayment deadline, without any intention of actually fulfilling such personal obligation.

58.     Ms. Mikhailova supplied Dreymoor with her promises, statements, and representations with the intention of inducing Dreymoor to delay, forebear, grant extensions of time, or take other action relative to the Contracts and Product she desired.

59.     Dreymoor reasonably relied on Ms. Mikhailova's promises, statements, and representations, and in doing so granted Ms. Mikhailova and AVAgro extensions of time to repay and suffered business losses and damages as a result. Further, in reasonable reliance on Ms. Mikhailova's promises, statements, and representations, Dreymoor withheld taking action to seize and sell the Product, thereby causing storage fees and costs with the warehouse to mount, not to mention the fact Ms. Mikhailova and AVAgro also thwarted Dreymoor's access to the Product at the warehouse, thereby also causing storage fees and costs to mount while the Product has declined in value.

60.     Dreymoor is entitled to a judgment against Ms. Mikhailova for all damages resulting from her fraud and misrepresentation, including, without limitation, as of February 15, 2020, the amount due and owing to Dreymoor under the Contracts of €6,211,091.06 and $339,761.42, and starting 30 days thereafter simple daily interest of 0.02% accrues on unpaid amounts, until paid, plus all other business losses and damages suffered by Dreymoor, all damages related to storage costs and fees relative the Product in the warehouse, Dreymoor's attorney fees, costs, and expenses, and pre- and post-judgment interest at the maximum amount allowed by law.

CORE/9991000.5423/158595065.1

## COUNT II: NEGLIGENT MISREPRESENTATION & FRAUD

61.     The allegations contained in Paragraphs 1 through 60 are incorporated herein, as if stated in full.

62.     As set forth above, Ms. Mikhailova made representations to Dreymoor, in the course of her personal activities, business, profession, and employment, relative to the Contracts and Product, in which she had a direct or indirect pecuniary interest, for the guidance of Dreymoor in its business transactions and decisions, which she should have known were false and misleading.

63.     Even if Ms. Mikhailova honestly believed that those representations were true, she had no reasonable grounds for believing the representations were true when she made them.

64.     Ms. Mikhailova intended that Dreymoor rely on her representations.

65.     Plaintiff reasonably relied on Ms. Mikhailova's representations. Relying on prior business dealings with Ms. Mikhailova over the years relating to similar transactions and similar products, Plaintiff trusted Ms. Mikhailova and thereby entered into the Contracts.

66.     Plaintiff was harmed by Ms. Mikhailova. Despite repeated demands that Ms. Mikhailova repay the loan, Ms. Mikhailova refused, and continues to refuse, to do to.

67.     Plaintiff's reliance on Ms. Mikhailova's representations was a substantial factor in causing her harm.

## COUNT III: INTENTIONAL OR NEGLIGENT INTERFERENCE
## WITH BUSINESS RELATIONS

68.     The allegations contained in Paragraphs 1 through 67 are incorporated herein, as if stated in full.

69.     A business relationship exists between Plaintiff and various banks through which Dreymoor obtains funding for its business, including Unicredit Bank AG. Ms. Mikhailova was

16

aware of that relationship from her many prior dealings with Dreymoor, which included financing provided to Dreymoor by Unicredit with regard to transactions with AVAgro.

70.    Ms. Mikhailova's misrepresentations outlined above were intended to benefit her, personally through her ownership interest in AVAgro, at the expense of Dreymoor's commercial relationships with various banks it utilized for funding its business and upon which transactions such as the one at issue depended.

71.    In making those misrepresentations, Ms. Mikhailova either intentionally interfered or disrupted Plaintiff's various banking relationships, or she should have reasonably known that her actions would do so.

72.    As a result of Ms. Mikhailova's actions, Plaintiff has suffered damages.

## COUNT IV: FRAUDULENT CONVEYANCE

73.    The allegations contained in Paragraphs 1 through 72 are incorporated herein, as if stated in full.

74.    This is an action for equitable and other relief pursuant to Kansas Statutes Chapter 33. Statute of Frauds; Fraudulent Conveyances § 33-204.

75.    Ms. Mikhailova has engaged in fraudulent acts in furtherance of a fraudulent scheme to transfer her assets out of the reach of Dreymoor. In doing so, she conspired with various currently unidentified third parties which enabled both Ms. Mikhailova and those third parties to divert assets which otherwise should have been used to pay the debt owing to Dreymoor.

76.    In 2019, UAB AVAgro initiated an action against Dreymoor, and Dreymoor initiated a counterclaim against AVAgro LLC, in an action UAB AVAgro v. Dreymoor,

International Centre For Dispute Resolution International Arbitration Rules and Procedures, Case No. 01-19-0000-3381.

77.     In or about December, 2019, AVAgro LLC conspired with defendant and other currently unidentified third parties to transfer the proceeds of the sale of certain of its products stored at a facility in Virginia to various third parties and/or to Ms. Mikhailova, in order to shield those funds from creditors and especially to shield Dreymoor from using those proceeds to satisfy the eventual judgment in the arbitration.

78.     The transfer was made without adequate compensation.

79.     Ms. Mikhailova and her third party conspirators acted with actual intent to hinder, delay and defraud the creditors of AVAgro LLC, including Dreymoor, by fraudulently transferring assets to herself without adequate compensation.

80.     Dreymoor lacks an adequate remedy at law because, unless the relief sought in this count is granted, Ms. Mikhailova and her third party conspirators will have succeeded in fraudulently receiving assets that should have been used to satisfy the judgment in the arbitration.

81.     Plaintiff has a high probability of success on the merits in this action.

82.     Thus, the transfers at issue are fraudulent transfers in violation of § 33-204.

## COUNT V: PIERCING THE CORPORATE VEIL

83.     The allegations contained in Paragraphs 1 through 82 are incorporated herein, as if stated in full.

84.     Ms. Mikhailova has operated the corporate entities of AVAgro LLC and UAB AVAgro as a sham, without following proper corporate formalities and without proper

capitalization. Ms. Mikhailova used corporate names interchangeably, and signed emails and documents personally.

85.     In addition, Ms. Mikhailova conspired with currently unidentified third parties to shield the true ownership of AVAgro LLC and UAB AVAgro, to shield the assets of those entities, and to protect the interests of those third parties from their creditors, including Dreymoor.

86.     On information and belief, Ms. Mikhailova, in conspiracy with such third parties, has operated the corporate entities of AVAgro LLC and UAB AVAgro in a manner so as to perpetuate a fraud and/or injustice against Dreymoor.

87.     On information and belief, Ms. Mikhailova operated the corporate entities of AVAgro LLC and UAB AVAgro as a facade for herself and such third parties.

88.     On information and belief, Ms. Mikhailova and her co-conspirators so dominated the corporate entities of AVAgro LLC and UAB AVAgro that they had no separate existence and were the *alter ego*, conduit, or instrumentality of Ms. Mikhailova and her co-conspirators.

89.     Dreymoor can pierce the corporate veil of AVAgro LLC and UAB AVAgro and hold Ms. Mikhailova and her co-conspirators personally liable and responsible for the corporate entities' debts and obligations. Piercing the corporate veil is necessary to achieve equity and justice.

90.     AVAgro LLC and UAB AVAgro have admittedly failed to comply with the Contracts and are in breach of the obligations to repay Dreymoor. As a result of such breach, Dreymoor has been substantially prejudiced and damaged, as being deprived of its funds has hindered Dreymoor's ability to conduct its own business and storage costs associated with the Product continue to mount.

91.     Dreymoor is entitled to a judgment against Ms. Mikhailova, for all the same damages due and owing to Dreymoor by AVAgro LLC and UAB AVAgro, including, without limitation, as of February 15, 2020, the amount due and owing to Dreymoor under the Contracts of €6,211,091.06 and $339,761.42, and starting 30 days thereafter simple daily interest of 0.02% accrues on unpaid amounts, until paid, plus all other business losses and damages suffered by Dreymoor, Dreymoor's attorney fees, costs, and expenses, and pre- and post-judgment interest at the maximum amount allowed by law.

## COUNT VI: BREACH OF CONTRACT GUARANTY

92.     The allegations contained in Paragraphs 1 through 91 are incorporated herein, as if stated in full.

93.     A legally valid and enforceable contract and agreement exists, wherein Ms. Mikhailova personally guaranteed payment to Dreymoor on all obligations due and owing from AVAgro relative to the Contracts and Product.

94.     Ms. Mikhailova's obligations under the personal guaranty are joint and several with AVAgro.

95.     Despite demand, AVAgro and Ms. Mikhailova have failed to pay Dreymoor when due. Accordingly, Ms. Mikhailova is in breach of her personal guaranty obligations to Dreymoor.

96.     Dreymoor is entitled to a judgment against Ms. Mikhailova awarding it the full amount due and owing under the Contracts. As of February 15, 2020, the amount due and owing to Dreymoor under the Contracts is €6,211,091.06 and $339,761.42, and starting 30 days thereafter simple daily interest of 0.02% accrues on unpaid amounts, until paid, plus Dreymoor's

attorney fees, costs, and expenses relative to obtaining payment, and post-judgment interest at the maximum amount allowed by law.

## COUNT VII: PROMISSORY ESTOPPEL

97.     The allegations contained in Paragraphs 1 through 96 are incorporated herein, as if stated in full.

98.     Ms. Mikhailova made promises and representations to Dreymoor, verbally and in writing, that she would personally guaranty payment to Dreymoor under the Contracts, among other promises by Ms. Mikhailova that Dreymoor would not suffer any losses as a result of financing the Contracts.

99.     The promises and representations made by Ms. Mikhailova relative to her personal guaranty of payment to Dreymoor induced Dreymoor, among other things, to allow more time for repayment of the obligations, e.g., Amendment #2 and the Agreement on Repayment and Pledge.

100.    The action and forbearance by Dreymoor induced by Ms. Mikhailova's promise and representation of a personal guaranty was definite and substantial in character.

101.    If Ms. Mikhailova is not held liable on the promise and representation of her personal guaranty to Dreymoor of the obligations owing relative to the Contracts, a substantial injustice and inequity will occur.

102.    Dreymoor is entitled to a judgment enforcing Ms. Mikhailova's personal guaranty of the obligations owing relative to the Contracts, under the doctrine of promissory estoppel, so as to fulfill the parties' expectations based on Ms. Mikhailova's promises and representations and to avoid injustice and inequity that would result in the absence of such enforcement. As of February 15, 2020, the amount due and owing to Dreymoor under the Contracts is €6,211,091.06

and $339,761.42, and starting 30 days thereafter simple daily interest of 0.02% accrues on unpaid amounts, until paid, plus Dreymoor's attorney fees, costs, and expenses relative to obtaining payment, and post-judgment interest at the maximum amount allowed by law.

<u>**COUNT VIII: PUNITIVE DAMAGES**</u>

103.    The allegations contained in Paragraphs 1 through 102 are incorporated herein, as if stated in full.

104.    Ms. Mikhailova knew or should have known the promises, statements, and representations she made to Dreymoor were false, reckless, and misleading.

105.    Ms. Mikhailova's misrepresentations, statements, conduct, and acts relative to Dreymoor, the Contracts, the Product, and the operation of AVAgro LLC and UAB AVAgro were willful, wanton, fraudulent, reckless, and/or malicious.

106.    Dreymoor is entitled to recover punitive damages from Ms. Mikhailova relative to its claims herein, pursuant to K.S.A. 60-3701.

WHEREFORE, Plaintiff Dreymoor Fertilizers Overseas Pte. Ltd. respectfully requests judgment against Defendant Anna Mikhailova n/k/a a/k/a Anna Adams: (a) consistent with the relief sought herein, jointly and severally as it relates to all debts owing by AVAgro LLC and UAB AVAgro to Dreymoor, in the amounts of €6,211,091.06 and $339,761.42, as of February 15, 2020, and starting 30 days thereafter simple daily interest of 0.02% accrues on unpaid amounts, until paid; (b) for all other damages and business losses sustained by Dreymoor as a result of Ms. Mikhailova's intentional misrepresentation and fraud, negligent misrepresentation and fraud, intentional or negligent interference with business relations, fraudulent conveyance, breach of guaranty, and promissory estoppel, including, without limitation, all costs and expenses associated with storage fees and costs related to the Product; (c) that Ms. Mikhailova is

personally liable and responsible for all debts and damages due and owing from the corporate entities of AVAgro LLC and UAB AVAgro, under *alter ego* and piercing of the corporate veil, in the amounts at least as equal to subparts (a) and (b) of this paragraph; (d) for punitive damages; (e) for Dreymoor's attorney fees, costs, and expenses incurred in attempting to collect and in this action; (f) for the costs of this action to be charged against Ms. Mikhailova; and (g) for such other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this matter for all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates Wichita, Kansas as the place for trial in this matter.

Respectfully submitted,

*/s/ Lynn D. Preheim*
Lynn D. Preheim, SCt. #13300
Anna C. Ritchie, SCt. #24934
STINSON LLP
1625 N. Waterfront Parkway, Suite 300
Wichita, KS 67206-6620
Phone: (316) 268-7930
Fax: (316) 265-1349
lynn.preheim@stinson.com
anna.ritchie@stinson.com

***Attorneys for Plaintiff***